William G. Coleman, J.
The defendant Delmar ft. Jones was arrested on July 21, 1973 by Patrolman J. T. Murphy of the Town of Tonawanda Police Department. He was given a summons for driving while intoxicated which is a misdemeanor under subdivision 3 of section 1192 of the Vehicle and Traffic Law.
When arraigned he entered a plea of guilty. At the time he had no lawyer and indicated that he did not want one. The matter was adjourned for sentence at that time.
Prior to the date set for sentence, attorney Richard Grimm appeared on behalf of the defendant and requested an opportunity to withdraw defendant’s plea. Permission was granted and trial was thereafter had without a jury on December 4,1973. At the conclusion the court reserved decision.
This defendant was allegedly involved in an accident on Eggert Road near the intersection of Sheridan Drive in the Town of Tonawanda on the evening of July 21, 1973. When Officer Murphy arrived on the scene the defendant was behind the wheel of a 1966 Pontiac automobile and the motor was still running. Other persons in the area told the officer that the defendant had been driving and that he was “intoxicated”. Officer Murphy recited that the defendant’s “ speech was slurred, his eyes were glassy, his gait unsteady and his breath smelled strongly of alcoholic beverages.”
After some questioning, the defendant admitted to Officer Murphy that he had been driving. The said admission was the subject of a motion for suppression upon which the court also reserved decision.
In light of the original plea of guilty entered by the defendant and the observations of Officer Murphy at the scene, I am satisfied that the defendant was operating the vehicle in question on July 21, 1973. The motion to suppress is therefore academic at this point.
*35 A blood alcohol tost given at the Kenmore Police Department produced a reading of .28% by weight of alcohol in the defendant’s blood. For the reasons hereinafter stated, the court will not consider in detail objections raised to the qualifications of Captain Kane who administered the test.
The very serious question now confronting the court is how to determine whether the defendant violated subdivisions 1, 2 and 3 of section 1192 of the Vehicle and Traffic Law. There does not appear to be any standard in New York by which I can advise a jury or myself of the distinction between driving while one’s ability is impaired by the use of alcohol and driving while intoxicated.
Prior to January 1, 1971, under subdivision 2 of section 1192 of the Vehicle and Traffic Law, proof that person had more than .15% by weight of alcohol in his blood at the time a test was administered was prima facie evidence that he was driving while intoxicated. The test had to be administered within two hours after arrest. This presumption of intoxication was removed by amendment of the Vehicle and Traffic Law on January 1, 1971 and has never been reinstated. Without the benefit of such a presumption, the court must rely upon evidence of defendant’s mental condition and physical co-ordination as well as the blood test. There will be instances where no reasonable doubt exists as to the defendant’s intoxication. Nevertheless in many cases, it will be most difficult to detect the difference between driving while impaired and driving while intoxicated.
The manual provided to all Town Justices in New York by the Association of Towns suggests the following as a guideline:
“Definition of Intoxicated”
“ It has been held that the operation of a motor vehicle while in an intoxicated condition is the operation of such a motor vehicle by a person who has imbibed alcoholic beverages to such an extent as to impair his judgment and his ability to operate a motor vehicle. It may be said that person is intoxicated for these purposes when he has imbibed enough alcoholic beverages to impair his ability to think and act clearly and when he has lost, even in part, the control of his mental and physical facilities necessary to give that attention and care to the operation of his motor vehicle that a man of prudence and of reasonable intelligence would give to it. Furthermore, before the defendant can be convicted, you must find beyond a reasonable doubt that the defendant’s intoxicated condition was voluntary.
*36 1 ‘ note : A formal definition for Driving While Ability Impaired has not been formulated by statute or the courts.”
In the ancient Alabama case of Holley v. State (25 Ala. App. 260, 261) the court stated: “ The argument is made that there is a material substantial difference between ‘ being under the influence of intoxicating liquors ’ and being intoxicated. ’ The difference is that of ‘ Tweedle dee and Tweedle dum If a man is under the influence of intoxicating liquors he is intoxicated, and, if he is intoxicated within the meaning of this statute, he is under the influence of intoxicating liquor. There are perhaps as many stages of intoxication as there are varieties of Heinz pickles, and the party affected rarely knows when he passes from one to another. But, in whatever stage he is, if he drives a vehicle upon the public road he becomes a menace to the public and subjects himself to the penalties of the statute.”
When the Legislature on January 1, 1971 removed the presumption of intoxication, subdivision 2 of section 1192 was amended to read as follows: “ No person shall operate a motor vehicle while he has .15 of one per centum or more by weight of alcohol in his blood, as shown by chemical analysis of his blood, breath, urine or saliva, made pursuant to the provisions of section eleven hundred ninety-four of this chapter.”
Violation of this new section was made a misdemeanor. The amount of alcohol required to prove this violation was reduced on January 1, 1972 to .12% and on January 1, 1973 to .10%.
Perhaps the Legislature was concerned with the problem of courts ’ and jurors ’ trying to distinguish between driving while impaired and driving while intoxicated. Jurors had long been accused of not wanting to convict a person of driving while intoxicated because “ There, but for the grace of God, go I.” In any event, courts and juries how had a new standard by which an operator could be convicted of a misdemeanor. All the District Attorney would have to prove was the result of a blood test taken within two hours after an arrest was made.
Contrary to newspaper reports, a reading of .10 does not mean that the defendant is intoxicated. It does mean, however, that he has committed a misdemeanor. If that is what the Legislature intended, I doubt that most District Attorneys understand or accept it. I have never seen a trial conducted with this theory in mind or had a request to so charge a jury. Perhaps one reason why District Attorneys do not adopt this theory is that there is really no way to prove the actual concentration of alcohol in a person’s blood at the time his vehicle was being operated by means of a test taken as much as two *37 hours after arrest. That is what subdivision 2 of section 1192 requires. It may very well be that a reading taken two hours after an arrest will be lower than a reading taken immediately after an arrest. On the other hand, it is entirely possible that a reading taken immediately after an arrest will show a very low concentration of alcohol in the defendant’s blood. Common sense would seem to be sufficient authority for such a statement.
If that is not enough, however, then I must rely upon an observation made by me at a breathalyzer demonstration I attended a year or two ago. This demonstration was conducted by the New York State Police or the Erie County Sheriff’s Department at a meeting of Magistrates and Court Clerks. Some of the persons who volunteered to take the test drank a considerable amount of alcoholic beverages in a short time. Their blood alcohol readings taken several minutes later were very low. Later on the readings were much higher. Before the alcohol was in the blood and in the area of the brain, these “volunteers” could probably operate motor vehicles reasonably well. They certainly appeared to be sober long after the drinking took place.
Like most Judges, I am very concerned with keeping intoxicated drivers off the highways. I am not satisfied however, that the New York Legislature has provided us with a workable statute. In the publication entitled 1 ‘ Defense of Drunk Driving Cases ’ ’, third edition by Richard E. Erwin, the following quotation appears at page 1-38 and makes sense to me: “ If the purpose of drunk driving legislation is to protect the public, why should not the criterion of whether the driver is 1 under the influence ’ be whether he has become an unsafe driver as a result of his imbibing? Such a rule would provide juries with a clear standard of the degree of impairment required without putting an undue burden on the prosecution. It would implement the basic policy underlying drunk driving legislation. Most important, it would protect the innocent drinker from an unjustified criminal conviction. Such a rule would not require the prosecution to prove that the accused was driving carelessly at the time of arrest. Indeed the confusion in this area probably stems from the failure of many courts to distinguish between driving ability impaired to the extent that he is not a safe driver, and driving unsafely at the time of arrest. All courts probably agree that the latter is not required. In rejecting the former as a requirement, however, many courts have confused the two requirements and thereby eliminated the one *38 significant standard for determining whether the faculties of the accused were sufficiently impaired. ’ ’
I see no real reason for trying to distinguish between intoxicated and impaired drivers by a reading on a breathalyzer. What a court and jury really want to know is ‘ ‘ What does .07 or .10 or .28 mean in terms of ability or lack of ability to react to traffic emergencies'? ” Frankly, I cannot describe what a .10 or .20 driver looks like.
Why can we not take moving pictures and tape recordings of allegedly intoxicated drivers as they are brought into headquarters immediately after an arrest. Their speech and their actions could be preserved for observation days, weeks or months later. Physical tests and mental tests could be standard procedures and their results could be preserved on the film and the tape. It has often been said that a picture is worth a thousand words and I am sure that this is so.
I have seen such moving pictures at lectures on the subject of drunk driving. It appears that such procedures result in many guilty pleas by persons who see themselves on film the morning after and realize how badly they were performing while under the influence of alcohol.
Bather than trying to distinguish between impaired and intoxicated drivers, the courts could function effectively in keeping dangerous drivers off the road if they were allowed to use more latitude in sentencing. The problem could be controlled by permissive revocations, longer suspensions, conditional discharges, incarceration when needed and stiff fines where justified.
Based upon the discussion of the statutes involved and the testimony of the prosecution’s witnesses, I must come to the conclusion that the defendant, Delmar Jones, was driving while impaired, a violation of subdivision 1 of section 1192 of the Vehicle and Traffic Law. I cannot find beyond a reasonable doubt that he violated either subdivision 2 or subdivision 3 of section 1192.
This matter is adjourned to February 12, 1974 at which time the defendant shall appear for sentence.